2009 VT 35

# Dr. Ebaristo "Abe" Herrera v. Union No. 39 School District and James Van Hoof

[975 A.2d 619]

No. 07-416

Present: Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Davenport, Supr. J., Specially Assigned

Opinion Filed March 20, 2009

Motion for Reargument Denied April 17, 2009

*Michael Marks* and *Daniel P. Richardson* of *Tarrant, Marks & Gillies*, Montpelier, for Plaintiff-Appellant.

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Defendants-Appellees.

¶ 1. **Burgess, J.** Plaintiff Ebaristo Herrera, former principal of Black River Union High School, appeals from a jury verdict and judgment against him on his claim that defendants deprived him of due process under 42 U.S.C. § 1983 when the school district terminated his employment. This case went to trial after a previous appeal in which we reversed the superior court's grant of summary judgment for defendants on this claim and a claim that defendants violated plaintiff's employment contract and his statutory rights as a principal. *Herrera v. Union No. 39 Sch. Dist.* (*Herrera I*), 2006 VT 83, 181 Vt. 198, 917 A.2d 923. *Herrera I* held that summary judgment was not appropriate for plaintiff's due process claim and remanded the case for development of the material facts related to whether plaintiff was deprived of any constitutionally protected liberty interest that would entitle him to an opportunity to clear his name as guaranteed by the Due Process Clause. *Id.* ¶ 32. We also decided that the school board's summary suspension-with-pay of plaintiff for the balance of his contract term was, effectively, a termination as a matter of law and remanded for a determination of damages on plaintiff's breach of contract claim. *Id.* ¶ 23.

¶ 2. Plaintiff contends that, on remand, the superior court erred by (1) refusing to rule that his liberty interest in future employment was violated as a matter of law, and instead allowing the jury to decide the issue; (2) allowing the jury to decide whether defendants provided plaintiff an adequate name-clearing hearing as required for due process; (3) granting judgment as a matter of law to the school district's former superintendent; (4) holding that the jury's verdict regarding the liberty-interest violation was supported by the evidence; and (5) denying plaintiff a new trial to establish damages suffered as a result of the liberty-interest violation. We affirm, and hold that, as a matter of law, plaintiff's liberty interests were not violated. The record provides no evidence that any action by the school board or the former superintendent stigmatized plaintiff in the manner required to support his claimed deprivation of a liberty interest. Consequently, defendants did not owe plaintiff a name-clearing hearing, and the remaining issues are moot.

## I. Background

¶ 3. Most of the background facts relevant to this appeal are recited in *Herrera I*, but we review them briefly here. Plaintiff

4

was hired by defendants in the spring of 2000 under a two-year contract. In the spring of 2001, the superintendent recommended that the school board terminate plaintiff's employment based on several performance issues. After holding a public hearing regarding the superintendent's recommendation and receiving feedback from community members, the school board decided to retain plaintiff as principal. However, the board also decided to conduct its own investigation into plaintiff's job performance. Various members of the board took part in that investigation during the summer and fall of 2001.

¶ 4. In November 2001, the superintendent submitted a performance evaluation of plaintiff to the school board and again recommended terminating plaintiff's employment due to poor job performance. At the end of that month, the school board held a meeting in executive session with plaintiff and the superintendent to discuss the performance evaluation. During the meeting, the board offered plaintiff the option to resign with full pay or to be terminated. Plaintiff did not choose either option, and the school board placed him on paid administrative leave while awaiting his decision.

¶ 5. The facts critical to the present appeal occurred a few weeks later, during a December 19, 2001 school board meeting. Although plaintiff's employment status was not on the board's agenda for that meeting, plaintiff attended the meeting and the meeting was filled with community members. When it became clear that the community members were attending the meeting in order to address plaintiff's employment status, the school board met in executive session and voted to place plaintiff on administrative leave for the remainder of the school year. The board also voted to not renew his contract with the school district. Following the executive session votes, the board and the superintendent returned to the public meeting and announced the board's decision. For the next hour, defendants responded to questions and comments from parents, students, and school employees regarding the board's decision and plaintiff's employment.

¶ 6. The video recording of this December 19 meeting, admitted as one of plaintiff's trial exhibits and viewed by the jury, showed that all of the community members who spoke were critical of defendants' decision and pressed repeatedly for detailed information about the reasons for ending plaintiff's employment. In response, defendants explained that their decision was based on

the same performance issues as were raised before by the superintendent, and as had been determined by the board's subsequent investigation. The board also explained that it could not elaborate on the reasons due to personnel confidentiality rules. It does not appear from the record that either the evaluation or the results of the board's investigations were ever made public, and defendants' references to them at the board meeting were made in only a general way without stating any specific findings about plaintiff's performance.

¶ 7. The superintendent disclaimed any suggestion that plaintiff was not good or helpful to children, and categorically denied disliking plaintiff. Listing some general skills he believed necessary for principals, the superintendent opined that plaintiff failed to fulfill "not all, but most" of those needs. One school board member stated that she could not be specific about why plaintiff was not qualified, but she reiterated that he was not qualified for the job. At the same time, she affirmed that plaintiff "is not a bad person, we all know that." Another school board member expressed his great frustration in not being able to tell the community the specific reasons for his vote, noting that he would be "doing [plaintiff] a great disservice" and putting the school board, and, by extension, the taxpayers, in jeopardy if he revealed the reasons for the school board's actions. One of the parents at the meeting, while speaking in support of plaintiff, acknowledged that she understood an employer's legal duty to keep employment matters confidential.

¶ 8. The day after the December 19, 2001 school board meeting, the Rutland Herald ran a story about the meeting, which included quotes from community members, school board members, and the superintendent, as well as the reporter's own observations of the meeting's events and on the statements that were made. According to the article, the board formally cited a "personnel evaluation" as the reason for plaintiff's termination, but the board *also said there had been potentially costly and damaging reasons for the firing — reasons not fit for public review.*" (Emphasis added.) The article went on to quote one school board member as saying, "I would be doing a great disservice if I were to publicize why [plaintiff was placed on administrative leave and his contract not renewed] . . . I would be putting the taxpayers in jeopardy. . . . It is incredibly frustrating not to be able to stand up and tell you why I did (vote to fire [plaintiff]). You all would pay for it."

Another member reportedly said that the board "didn't ask to be in this position . . . we thought [plaintiff] would be here for a number of years. He will not be here for a number of years." The superintendent was quoted to say, "I never ever would be recommending the removal of a principal unless I felt very strongly about that. I have never felt this strongly. . . . My job is to recommend what the school needs. It's my opinion that [plaintiff] hasn't done a very good job at that."

¶ 9. After the meeting, the board sent plaintiff two letters formally advising that he was placed on a paid leave of absence for the remainder of his contract and that the board had voted not to renew his contract. The letters also informed plaintiff of his contractual and statutory right to request a meeting with the school board regarding the nonrenewal of his contract, but stated that his suspension from duty would not be reviewed. The board informed plaintiff that he had a right to make a written and oral presentation at the meeting and to be represented by counsel. The letters stated that the board would make its final decision regarding renewal of plaintiff's contract after the meeting. Plaintiff requested a public hearing on both the paid-leave and the contract decisions, but the board refused, stating that he had no contractual or statutory right to contest the suspension decision, and that, by statute, the meeting would be public only if both the school board and plaintiff agreed. Because the board did not agree, it met in executive session with plaintiff in January 2002 to address only its decision not to renew his contract. Plaintiff was represented by counsel at this meeting, and he presented documents and witnesses on his behalf. Ultimately, the school board decided it would not renew the contract.

¶ 10. After plaintiff spent more than a year unsuccessfully seeking new employment, he filed the underlying lawsuit in May 2003. In the first trial, plaintiff stated four claims, including (1) the alleged due process violation at issue in the present appeal, (2) violation of his contractual and statutory rights as a principal, (3) defamation, and (4) racial discrimination in violation of Vermont's Fair Employment Practices Act. As noted above, the superior court granted summary judgment for defendants on the first two counts. The case proceeded to trial on the defamation and discrimination claims, and the jury found for defendants on both counts. As recounted earlier, this Court reversed the summary judgment, ruling that defendants did violate plaintiff's

contractual and statutory rights, *Herrera I*, 2006 VT 83, ¶ 20, and that the facts underlying the liberty-interest due process claim remained unresolved. *Id.* ¶ 32. On remand for trial on the merits of the due process claim, and on any damages arising from that count or the contractual and statutory violations, the second jury found for defendants on the due process claim and found that plaintiff suffered no damages from the violation of his contractual and statutory rights. Plaintiff appeals only the due process judgment here.

## II. Stigma as a Matter of Law

### a. "Stigma-Plus" Claims

■ ¶ 11. Plaintiff's due process complaint is what federal courts label a "stigma-plus" claim. See *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 n.1 (2d Cir. 2005) (tracing the genesis of the stigma-plus claim to *Paul v. Davis*, 424 U.S. 693 (1976), and the first use of the term "stigma-plus" to *Danno v. Peterson*, 421 F. Supp. 950, 954 (N.D. Ill. 1976)). Stigma-plus claims arise when an individual alleges both the loss of a legally recognized right or status due to government action, and reputation damage due to defamatory statements of government actors. See *Behrens v. Regier*, 422 F.3d 1255, 1260 (11th Cir. 2005) (citing *Paul*, 424 U.S. at 701-02, 711). When a stigma-plus claim arises in the context of an adverse employment action, and the government's defamation impinges on the individual's future opportunity for employment, she or he is afforded the protection of the Due Process Clause of the Fourteenth Amendment because one of the liberties protected by that clause is the individual's "right 'to engage in any of the common occupations of life.'" *Herrera I*, 2006 VT 83, ¶ 27 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972)).

■ ¶ 12. Two United States Supreme Court cases addressing the protection of liberty interests under the Due Process Clause of the Fourteenth Amendment serve as the guideposts for stigma-plus claims: *Board of Regents v. Roth* and *Paul v. Davis*. *Roth* held, in part, that the government's decision merely not to rehire a nontenured employee does not implicate protected liberty interests. 408 U.S. at 572-75. While the Court recognized that "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated," it concluded that *Roth* was "not such a case" because

8

the government had not made "any charge against him that might seriously damage his standing and associations in his community." *Id.* at 573. *Paul*, decided several years later, addressed the reverse of the *Roth* scenario, namely, the situation wherein the government makes defamatory or stigmatizing statements about an individual, but the individual suffers no concomitant loss of a legally recognized right or status. The Court concluded that governmental harm to reputation alone does not deprive individuals of any liberty interest, *Paul*, 424 U.S. at 712, observing that it had "never held that the mere defamation of an individual . . . was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment," *id.* at 706.

■ ¶ 13. As *Roth* and *Paul* demonstrate, no liberty-interest due process claim lies unless the individual experiences both the "stigma" of defamatory statements and the "plus" of adverse action by the government. Where it was shown that government actors made false and damaging statements, but the plaintiff did not lose employment or other right or entitlement under state law, courts have declined to find any due process violation. See, e.g., *Behrens*, 422 F.3d at 1261-62 (even though plaintiff was stigmatized as a "verified child abuser" by the state, plaintiff could not sustain stigma-plus claim because state law provided no right, protected interest, or entitlement to adopt children). Similarly, courts have rejected stigma-plus claims where individuals have lost government employment, but have not shown that the employer made any stigmatizing statements. See, e.g., *O'Connor v. Pierson*, 426 F.3d 187, 195-96 (2d Cir. 2005) (rejecting stigma-plus claim where plaintiff never alleged that school board made any stigmatizing statements about him, and concluding that plaintiff had alleged only "the plus without the stigma" with his argument that placement on administrative leave created the stigma). When both the "stigma" and the "plus" are present, the remedy for the due process violation is "a post-deprivation opportunity [for the plaintiff] to clear his name." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). If no name-clearing hearing is provided, or if the hearing is inadequate, the plaintiff may sue for monetary damages. *Id.* at 337.

¶ 14. Here, plaintiff sought judgment, before and after the verdict, that his termination, coupled with the comments by the board members and superintendent, presented a stigma-plus situ-

ation entitling him to a name-clearing hearing that defendants never afforded him. Because we agreed in *Herrera I* that defendants' decision to place plaintiff on paid administrative leave was tantamount to dismissal, 2006 VT 83, ¶¶ 15-16, and deprived him of the employment to which he was entitled under contract and state law, *id.* ¶ 20, we conclude that the "plus" component of plaintiff's stigma-plus claim is satisfied. Plaintiff's evidence concerning the board's and superintendent's statements, however, fails, as a matter of law, to establish the necessary element of stigma.

### b. Stigma in the Present Case

¶ 15. In the trial below, plaintiff moved for judgment as a matter of law on the stigma-plus claim at the close of defendants' case. V.R.C.P. 50. He argued he had proven both that defendants stigmatized him in the process of terminating his employment and that the January 2002 meeting with the school board was not an adequate name-clearing hearing. After the superior court denied his Rule 50 motion, the jury found, on the parties' special verdict form, that the school district had not violated plaintiff's due process rights "by the manner in which it terminated his employment without providing a proper hearing." Plaintiff renewed his motion for judgment as a matter of law on his due process claim, and when that motion was again denied, he appealed here.

¶ 16. We "review judgment as a matter of law under the same standard as the trial court." *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 477 (2000). We consider the "evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence." *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 2, 179 Vt. 167, 893 A.2d 298. In this case, the wording of the special verdict form merged two separate issues involved in this stigma-plus claim into one question. The issues might have been better put to the jury by asking first whether plaintiff had been stigmatized by defendants in the course of his termination from employment, then, if that question was answered in the affirmative, asking whether defendants failed to provide plaintiff an adequate name-clearing hearing. Instead, the special verdict form in this case asked both questions at once. Consequently, by answering in the negative to the compound question asked, the jury may have arrived at either of two conclusions: first, that plaintiff was not stigmatized, or, second, that he was stigmatized

but defendants gave him an adequate opportunity to clear his name. While we recognize the possibility that the jury may have reached the second conclusion, we conclude, upon review of the evidence under Rule 50 standards, that the evidence supports judgment for defendants because plaintiff was not stigmatized as that term is legally understood for purposes of due process analysis. See *Northshire Communications, Inc. v. AIU Ins. Co.*, 174 Vt. 295, 299, 811 A.2d 216, 220 (2002) (as long as "any evidence fairly or reasonably supports a lawful theory of the nonmoving party," we affirm the trial court's denial of a Rule 50 motion).

¶ 17. Plaintiff argues that *Herrera I* established that he was stigmatized by defendants' statements and that the sole issue on remand was whether defendants provided an adequate name-clearing hearing. He contends *Herrera I* concluded, as a matter of law, that defendants' statements and actions stigmatized him in violation of his due process rights. Plaintiff's characterization, however, was not our holding in that case.

¶ 18. In concluding that plaintiff's stigma-plus claim was not appropriate for summary judgment in *Herrera I*, we relied on the fact that the trial court had neither considered nor resolved the import of a statement the Rutland Herald attributed to the board that "there had been potentially costly and damaging reasons for the firing — reasons not fit for public review." We twice cited the "reasons not fit for public review" phrase from the article, *Herrera I*, 2006 VT 83, ¶¶ 29, 31, and observed that "*if it was accurate*, the board members implied that they had some extraordinary reason, beyond plaintiff's alleged incompetence, for dismissing him." *Id.* ¶ 31 (emphasis added). Under such circumstances, we opined, the "Due Process Clause entitled plaintiff to some opportunity to confront and refute such allegations." *Id.* Contrary to plaintiff's contention, we did not hold that the article itself established that government actors had stigmatized plaintiff as a matter of law. Our remand was for the superior court to determine the entire question of "whether plaintiff was deprived of a constitutionally protected liberty interest." *Id.* ¶ 32. This included whether the comments as related by the newspaper article could be established, if defendants had created stigma against plaintiff, and whether it was remedied by a name-clearing hearing.

■ ¶ 19. The jury instructions on stigma, to which both parties agreed, explained that "the evidence must show more than vague allegations of unspecified incompetence and more than the employment decision itself to place Doctor Herrera on administrative leave." This instruction serves as the law in this case, *Lemnah v. Am. Breeders Serv., Inc.*, 144 Vt. 568, 573, 482 A.2d 700, 703 (1984), and is consistent with the federal courts' interpretation of the law in stigma-plus cases. The first part of the jury instruction is taken directly from a United States Court of Appeals opinion, cited in *Herrera I*, requiring "that the defamatory statements be more than 'vague statements of unspecified "incompetence."'" *Herrera I*, 2006 VT 83, ¶ 28 (quoting *O'Neill v. City of Auburn*, 23 F.3d 685, 693 (2d Cir. 1994)). And, as explained above, to succeed in a stigma-plus claim, plaintiffs must prove not merely the loss of employment, but also that defendants made stigmatizing statements in the course of the employment decision. Thus, the second part of the jury instruction is not inconsistent with federal case law on stigma-plus claims. Plaintiff's evidence, however, when viewed in the light most favorable to defendants, did not show anything more than "the employment decision itself" and that defendants made "vague allegations of unspecified incompetence." Such evidence fails to satisfy the standards set in the instruction and the case law.

¶ 20. To establish the stigma element of his due process claim at trial, plaintiff presented the Rutland Herald article as an exhibit, and called several community members to testify to the impact of the Rutland Herald article on plaintiff's reputation in the community. Each witness stated that the article raised questions in the minds of people in the community as to why plaintiff was placed on leave. One of the witnesses stated that "everybody [in the community] thought . . . that possibly something horrible took place, or he did something very wrong to be let go." The second witness stated that "if [the reason for terminating plaintiff's employment] was so bad they couldn't talk about it, then it leaves you to wonder, speculate, and obviously you speculate the worst."

■ ¶ 21. In addition to the article and the witnesses, plaintiff introduced the videotape of the December school board meeting on which the article was based. The video shows, however, that the article was inaccurate in reporting that board members said that "there had been potentially costly and damaging reasons for

the firing — reasons not fit for public review." The video establishes that the board members said nothing of the sort. Instead, the board avoided specific details regarding plaintiff's employment because they were bound by plaintiff's right to confidentiality and were attempting to avoid the possibility of litigation over the same — not because plaintiff's conduct was somehow too terrible or too culpable to disclose. Instead, defendants explicitly stated, repeatedly, that plaintiff's employment was terminated for performance reasons. No defendant mentioned an instance of particular, let alone extraordinary, misconduct or any example of egregiously poor performance. Their comments at that meeting go no further than making the kinds of "vague allegations of unspecified incompetence" that are insufficient to establish stigma. Cf. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631-32 (2d Cir. 1996) (school district stigmatized assistant principal when it placed "extensively detailed lists of her supposed professional failings" in her personnel file, which was likely to be seen by potential future employers).

¶ 22. Because the videotape of the school board meeting proves that the article was not accurate, we conclude that the article is incapable of proving that defendants stigmatized plaintiff. Assuming, arguendo, that the passage concerning undisclosed misconduct unfit for public consumption could be construed as stigmatizing, that statement was neither made nor implied by the board members or the superintendent. The Constitution does not provide due process protection for individuals who are stigmatized by private, rather than by governmental, parties. Accord *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103-04 (1st Cir. 2002).

¶ 23. The other evidence adduced by plaintiff to show that defendants stigmatized him consisted of testimony by plaintiff and the superintendent. Plaintiff testified that, during the year after he was placed on administrative leave, he applied for forty to fifty administrative positions in schools around New England, and many more positions in the following year. According to his testimony, he was an interviewee and finalist for several principal positions, but once the potential employers discovered that he had been placed on administrative leave, his candidacy for those positions ended. Plaintiff called the superintendent as a witness, and in response to questions, the superintendent testified that the act of placing a school principal on administrative leave during the school year would be perceived very negatively by potential future

employers, and would make it very difficult for that principal to get a new job in a school system.

¶ 24. Whatever negative inference could be drawn from plaintiff's termination, it is indistinguishable from the unfortunate implications arising from any dismissal on undisclosed grounds of nonperformance. Showing no more than the negative connotation typically associated with "the employment decision itself to place Doctor Herrera on administrative leave," as explained in the agreed-upon jury instruction, plaintiff's evidence was inadequate to establish the element of stigma. His evidence did not prove a stigmatizing statement or action by defendants beyond the underlying statement of dismissal itself. It was not disputed, for example, that the superintendent, when called by potential employers of plaintiff, never gave any reasons for the school district's decision to place plaintiff on leave or to not renew his contract. The superintendent's statements at the public meeting regarding the employment decision did not venture past "vague statements of unspecified incompetence" insufficient to establish stigma, both under the law of this case and established stigma-plus precedent. *Herrera I*, 2006 VT 83, ¶ 28 (internal quotation and citation omitted).

¶ 25. The evidence presented at trial failed to establish that defendants stigmatized plaintiff, in the constitutional sense of depriving him of employment opportunity, beyond the act and declaration of his termination for performance reasons. Without such evidence, the trial court correctly concluded plaintiff was not due judgment as a matter of law on his stigma-plus claim. Consequently, the jury's verdict of no liability stands, and, because there was no stigma, we do not reach the question of whether plaintiff received a name-clearing hearing. Plaintiff's remaining claims are moot.

*Affirmed.*